PELL, Circuit Judge.
 

 Section 17(a)(2) of the Bankruptcy Act of 1938, 11 U.S.C. § 35(a)(2) (1960), provides that an individual’s debt shall not be discharged in bankruptcy if that debt or its renewal is the result of money obtained “in reliance [by the creditor] upon a materially false statement in writing respecting [the debtor’s] financial condition made or published ... with intent to deceive .... ” This appeal calls upon us to decide,
 
 inter alia,
 
 whether non-dischargeability is appropriate only where the creditor’s reliance under § 17(a)(2) is “reasonable.”
 

 Ben F. Garman, the bankrupt, a life insurance salesman, had been a customer of the Northern Trust Bank (Northern) in Chicago since 1962. Between December, 1970, and March, 1973, Garman borrowed various sums from the Northern resulting in a total indebtedness on November 1, 1973, of $30,-000. On that date, Garman executed a renewal note to the Northern for the entire outstanding amount.
 

 There is direct and unimpeached testimony in the record that the Northern, at least in part, expressly relied upon three financial statements submitted by Garman in making these loans.
 
 [1]
 
 It is uncontested by Garman that these statements omitted listing approximately $50,000 in “claims” that Garman later listed in his petition for bankruptcy.
 
 [2]
 
 These claims, however, are recorded as having arisen prior to the time Gar-man filed the statements with the Northern. Had these amounts been included as potential liabilities in the statements, they would have substantially reduced Garman’s net worth, in some instances to less than zero.
 

 Upon Garman’s failure to pay the $30,000 when due in April of 1974, the Northern filed suit against him for this amount in state court. On February 6, 1975, prior to judgment in the state court, Garman filed a voluntary petition in bankruptcy listing as unsecured claims to be discharged the $30,-000 debt to the Northern as well as the $50,000 in claims not listed on his financial statements. The Northern filed a com
 
 *1254
 
 plaint to prevent the discharge of the $30,-000 debt pursuant to § 17(a)(2), and a hearing was held on the issue before a bankruptcy judge on March 28 and 29,1977. At the hearing, the Northern introduced the testimony of Charles S. Bishop, a Northern vice-president, who had approved most of the loans to Garman, and Carol King, a loan officer who had approved the November 1, 1973 renewal, regarding their reliance on the Garman statements.
 
 [3]
 
 The Northern also introduced the various notes and statements signed by Garman. Each financial statement provided that it was “a true and complete statement of my financial condition, and details relating thereto.... I agree that if any material change occurs I will immediately notify you, unless you are so notified you may continue to rely upon the statement hereon given.” Bishop testified that had he known of the $50,000 in claims omitted from the statements, he would not have made the loans.
 

 Garman, testifying as an adverse witness, conceded that he had failed to list the $50,-000 in claims on the financial statement, but maintained that the omissions did not render the statements false. Our examination of his testimony leaves us with the firm conviction that not only was Garman an evasive witness, but that his testimony was inherently incredible. A few illustrations are sufficient to demonstrate our conclusion. One of the creditors listed on Schedule A-3 of the bankruptcy petition was a Dr. Solomon with the claim stated as being approximately $10,800. Garman’s attention was directed to the statement at the bottom of the page of Schedule A-3 that “none of the foregoing indebtedness, listed above, are contingent, liquidated or disputed, unless otherwise stated.” When asked about the debt to Solomon which has been listed in the schedule without qualification, Garman responded, “[Y]ou keep referring to a debt. We are talking about unsecured claims. I am not talking about any debt.” This was followed by an assertion that when he “signed that statement [he] did not acknowledge that was a debt.” The record does not indicate whether he was referring here to the bankruptcy schedule or to the financial statement. Either interpretation, however, would fail of verity. If he was referring to the schedule, it clearly refers to “indebtedness.” On the other hand, if he was referring to the financial statements, which were signed in the early 1970’s, the Solomon claim was not listed although on the schedule he listed it as having been incurred in October, 1968. When asked specifically about listing this item on the financial statements, he said, “It talks about contingent liabilities, sir. I did not have a contingent liability at that time.” When the Solomon matter was pursued further, this non-illuminating colloquy followed:
 

 Q. I will rephrase the question.
 

 Mr. Garman, in examining the financial statements marked as Plaintiff’s Exhibit Nos. 2, 4, and 7, could you tell me if, reflected on any one of those financial statements, is this claim of Dr. Solomon that is reflected on the bankruptcy petition, is it reflected on any one of those three financial statements?
 

 A. I’m sorry, I can’t answer the question.
 

 I find the discrepancy between claim and liability. This is talking about a liability and this is talking about a claim.
 

 Q. You are not answering my question.
 

 A. I can’t answer your question.
 

 THE COURT: That is an answer.
 

 The statement that he could not answer the question was repeated with regard to another item of indebtedness listed on the bankruptcy schedule as having been incurred in February, 1972, even though he
 
 *1255
 
 was being shown a subsequent-in-time financial statement which clearly did not include the debt. On subsequent references to the financial statements, Garman admitted that items were not listed there but did appear on the bankruptcy schedule, including $4,000 indebtedness to another bank resulting from various loans extended over the past five years, and a promissory note to an estate for $5,000 which related back to January, 1968.
 

 Professing that he was “a student of semantics,” Garman periodically stated that he could not answer questions, stating on one occasion, “[Y]ou ask me about debts, on the other hand, you are talking about claims.” When examined by his own counsel, Garman, in significant candor, related that it had been made clear to him when he was filing in bankruptcy that possible claims should be listed because once he had filed he could not go back and claim that he had forgotten them. His concern about not having possible claims discharged in bankruptcy did not extend to an equal disclosure when he was borrowing money from Northern. Garman further testified that the unlisted items on the financial statements were not legal documents, they were just informal agreements, and that he did not feel that the word “debt” did “justice to what was involved here as the listing of a claim.” The gist of his testimony with regard to a substantial amount of the unlisted items was that Garman would purchase, or would recommend purchase, of certain investments which would be bought with money from friends, and he would share in 50% of the gains but would be responsible for 100% of the losses. He testified he did not consider these as “debts” although he did concede that the $5,000 promissory note, which was also unlisted on the financial statements, was an exception. In sum, while he considered that he had to list all possible claims on the bankruptcy schedule, he felt no similar compulsion on the financial statements even though an answer was required on “other contingent liabilities.” Subsequent statements listed no contingent liabilities.
 

 At the conclusion of the hearing, the bankruptcy judge issued no written findings and made no oral findings regarding the materiality of the omissions in the statements or Garman’s intent when he filed the statements. Rather, the bankruptcy judge held that the Northern had failed to establish its entitlement to non-discharge of Garman’s debt to it because it had not proved it had “reasonably relied” upon the statements. Although the bankruptcy judge’s statements do not make clear whether he was basing his decision on a finding of no actual reliance or of no reasonable reliance, the district court on appeal held, correctly we believe, that “it is clear that the bankruptcy judge’s dismissal was predicated upon his findings of no reasonable reliance.”
 
 [4]
 
 The district judge then affirmed the bankruptcy court, stating: “In addition to the requirement that the creditor actually relied, it is clear that § 35(a)(2) requires that the creditor’s reliance must have been reasonable." Viewing what it held to be a finding of fact by the bankruptcy judge, the district court held that the finding that the Northern could not have reasonably relied upon these statements was not “clearly erroneous.”
 

 Initially, we note that § 17(a)(2), unlike its successor,
 
 [5]
 
 does not by its terms require a showing of “reasonable reliance” and re
 
 *1256
 
 quires only a showing of reliance in fact.
 
 [6]
 
 Nevertheless, Garman relies upon a number of decisions ostensibly requiring a showing of reasonableness.
 
 Carini v. Matera,
 
 592 F.2d 378 (7th Cir. 1979);
 
 Kentile Floors, Inc. v. Winham,
 
 440 F.2d 1128 (9th Cir. 1971);
 
 In re: Smith,
 
 424 F.Supp. 858 (M.D.La.1976);
 
 In re: Adams,
 
 368 F.Supp. 80 (D.S.D.1973);
 
 Sweet v. Ritter Finance Co.,
 
 263 F.Supp. 540 (W.D.Va.1967);
 
 In re: Disbrow,
 
 20 Colliers Bankr. Cases 1149 (D.Ver. 1979);
 
 In re: Ducote,
 
 4 Bankr.Ct.Dec. 943 (W.D.La.1978);
 
 In re: Gibbs,
 
 9 Colliers Bankr. Cases 608 (M.D.Fla.1976);
 
 In re: Arden,
 
 2 Bankr.Ct.Dec. 204 (D.R.I.1975);
 
 Cash Finance Service, Inc. v. Haisch,
 
 173 So.2d 851 (La.App.1965). We believe, however, Garman misinterprets these cases in arguing that they bar the Northern’s requested relief.
 

 Although some of the mentioned cases do, in fact, refer to “reasonable” or justifiable reliance as a requirement under § 17(a)(2), they do not require the court, as was done in the present case, to undertake a subjective evaluation and judgment of a creditor’s lending policy and practices. These cases simply stand for the proposition that reasonableness is circumstantial evidence of actual reliance; that is, dischargeability shall not be denied where a creditor’s claimed “reliance” on a “financial statement” would be so unreasonable as not to be actual reliance at all. The opinions relied upon either state this directly, e.
 
 g., Smith,
 
 and see
 
 Adams
 
 and
 
 Sweet,
 
 or the lack of actual reliance was implicit in the record. In
 
 Arden, for example,
 
 the court held that the creditor knew the alleged misrepresentation was false at the time the loan was made and therefore could not have “reasonably” relied on the “misrepresentation.” The court’s decision to allow discharge, furthermore, was based upon its holding that the creditor had failed to prove the debtor’s intent to defraud. In
 
 Sweet,
 
 one debtor, the husband, could neither read nor write except to sign his name on the statement filled out and signed by his wife. The entire transaction was completed in “no more than two minutes” and the creditor, although charging 30% interest on a portion of the amounts lent, never asked any questions concerning the listed assets or liabilities. The court noted the creditor was simply “taking advantage of a borrower’s ignorance” and held that indications that the creditor was well aware of the unsound financial condition of the debtor yet exercised an “almost studied disregard for the truth ... is enough in many instances to preclude a later claim by the loan company that its reliance on the false financial statement was reasonable.” 263 F.Supp., at 542. In
 
 Kentile Floors,
 
 and
 
 Disbrow,
 
 as in
 
 Sweet,
 
 the creditor possessed information that conflicted with the apparent financial well-being portrayed on the debtor’s financial statement. In
 
 Cash Finance,
 
 the statement was all but illegible and the court found that it was “obvious” that the list of debts in the statement was incomplete. In
 
 Du-cote,
 
 the money was transferred to the debtor at the same time the first financial statement was submitted, thus indicating that “the loan had already been approved when [the debtor] filed the signed financial statement.” 4 Bankr.Ct.Dec. at 944.
 
 See also Gibbs
 
 and
 
 Sweet, supra.
 
 In
 
 Smith
 
 and
 
 Gibbs,
 
 the debtor was a total stranger to the lender and the “financial statement,” which was “nothing more than [a] typewritten statement on the stationery of the com-pan[y] whose financial status they purported] to represent,”
 
 id.
 
 at 862, was unsigned by the debtor. In
 
 Carini,
 
 this court simply stated, “And of course such reliance must be reasonable” while affirming the district court’s finding of reasonable reliance. 592 F.2d at 381.
 

 These cases present factual circumstances far different from the one before us here.
 
 *1257
 
 Garman, the debtor, was a sophisticated businessman who had a long-standing and apparently successful business relationship with the Northern for many years prior to his default.
 
 See, Carini,
 
 at 381. The financial statements he signed did not on their faces indicate the presence of any material misrepresentations or omissions, showed his net worth well in excess of the loaned amount, and affirmatively required him to notify the Northern in the event of any material change in his financial condition.
 
 Compare, Disbrow.
 
 Furthermore, the Northern had no information indicating that anything stated in the financial statements might be materially false.
 
 [7]
 
 In sum, there are no facts presented suggesting that the Northern utilized the financial statement simply as a “perfunctory device to be used to contest discharge, and not used to be relied thereon,” 1A Colliers on Bankruptcy, ¶ 17.16 at 1636 n. 17 (14th ed., 1979), was simply “burying its commercial head in the sand,”
 
 Arden, supra
 
 at 207, or that the Northern’s reliance on the financial statements was so unreasonable as not to be actual reliance at all.
 

 Garman protests, however, that to allow Northern to bar discharge in this case would defeat the well-established principle that the Bankruptcy Act “ultimately favors the debtor who invokes its protection.”
 
 In re: Schmelzer,
 
 350 F.Supp. 429, 435 (S.D. Ohio 1972),
 
 aff’d
 
 480 F.2d 1074 (6th Cir. 1973). This would be true, of course, in every case where discharge is denied, yet this has failed to preclude the denial of discharge in cases where § 17(a)(2) applied. We believe the Act was meant to discharge only the
 
 honest
 
 debtor from his debts,
 
 Williams v. United States Fidelity & Guaranty Co.,
 
 236 U.S. 549, 555, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915), and that the Act should be liberally applied to protect the bankrupt only in those cases where there is no intent to violate its provisions.
 
 In re: Schwartz,
 
 133 F.2d 216, 217 (7th Cir. 1943);
 
 Cunningham v. Elco Distributors,
 
 189 F.2d 87, 89 (6th Cir. 1951); As was stated by the Supreme Court in
 
 Bruning v. United States,
 
 376 U.S. 358, 361, 84 S.Ct. 906, 908, 11 L.Ed.2d 772 (1964):
 

 .. . petitioner [is not] aided by the now-familiar principle that one main purpose of the Bankruptcy Act is to let the honest debtor begin his financial life anew. As the Court of Appeals noted, § 17 is not a compassionate section for debtors. Rather, it demonstrates congressional judgment that certain problems ... override the value of giving the debtor a wholly fresh start. (Footnote omitted.)
 

 See also United States v. Sotelo,
 
 436 U.S. 268, 278-79, 98 S.Ct. 1795, 1801-02, 56 L.Ed.2d 275 (1977).
 

 The bankruptcy and district judges’ analyses of the present case, in fact, illustrate the very problems potentially arising from their interpretation of the above mentioned cases. Indeed, their analyses did not address whether the Northern’s reliance
 
 on the statements
 
 was reasonable. Rather, they expressed their judgment on whether the decision
 
 to loan Garman the money
 
 was reasonable.
 
 [8]
 
 They did not hold that the financial statements showing Garman’s net
 
 *1258
 
 worth in excess of the loaned amount was inherently unreliable; rather, they were concerned by the fact that the Northern would have based its decision to lend money on the net worth and nature of the assets of the debtor rather than the debtor’s income.
 
 [9]
 
 However, it is not the court’s duty under § 17(a)(2) to second guess a creditor’s decision to make a loan or to set loan policy for the creditor. If a lender chooses to let net worth rather than income be the determinative factor in loan decisions, it is not for the court to say that this is bad business policy requiring discharge of the resulting debt in bankruptcy. The present issue for the court is simply whether the bankrupt obtained credit, or a renewal, through the creditor’s reliance on a materially false financial statement containing information apparently sufficient to obtain an accurate picture of the debtor’s financial condition with regard to a reasonable decisional factor in the loan decision, filed by the debtor with the intent to deceive the creditor. The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact. Given this reliance, the court, with the benefit of hindsight, should not base its decision regarding discharge on whether
 
 it
 
 would have extended the loan. In the present case, the Northern’s financial statement form requested sufficient information to obtain an accurate picture of the debtor’s net worth, a reasonable decisional factor in the loan decision. To say the Northern should have looked to Garman’s income flow instead of net worth is irrelevant to the § 17(a)(2) issues.
 

 The bankruptcy and district judges were also concerned, however, with the fact that at the time the final renewal was granted on November 1, 1973, the most recent financial statement was more than seven months old. We also note that prior loans were granted in reliance upon financial statements that were slightly more than a year old. Although this fact also may raise questions regarding the business judgment shown in the decision to lend the money, we do not think this time lapse renders Northern’s reliance on the statements so unreasonable as not to be reliance in fact. In
 
 Gerdes v. Lustgarden,
 
 266 U.S. 321, 45 S.Ct. 107, 69 L.Ed. 309 (1924), the debtor submitted a financial statement on January 5, 1920, containing, as in the present case, a statement that he would notify the creditor
 
 *1259
 
 as to any material changes in his financial condition, and that the creditor could continue to rely upon the statement until so notified. Based upon this representation, the creditor, a bank, advanced funds in October and November 1920 and in February of 1921. Upon the debtor’s bankruptcy, the bank moved to avoid discharge of the debt pursuant to § 14(b) of the Bankruptcy Act of 1910. The bankruptcy referee allowed the discharge holding that even if the bank had in fact relied upon the statement, “it had no right so to do, since in view of the financial depression prevailing in 1920, the ‘reasonable time’ for which the statement remained a ‘continuing statement’ had expired when the credits were extended.” 266 U.S. at 324, 45 S.Ct. at 108. The district court reversed, finding that the bank had a right to rely upon the statements, but the court of appeals reversed the district court judgment, holding that the lapse of time rendered the bank’s reliance unjustified. The Supreme Court reversed the court of appeals, however, stating:
 

 The only essentials to the statutory bar ... are (a) that the written statement was made for the purpose of obtaining credit; (b) that it was materially false; and (c) that the credit was obtained upon it. If these are established the vice inherent in the original falsity of the statement is not remedied by the lapse of time; and if the creditor extends credit upon such a false statement while it is still in force and binding upon the bankrupt, within the time in which he intended it should serve that end, it does not lie in his mouth to say that by reason of extrinsic circumstances the creditor was not justified in relying upon it. In short, the lapse of time is only material in determining whether credit was extended within the period intended, while the statement was still binding on the bankrupt, and whether the creditor in fact extended credit upon the faith of the statement.
 

 266 U.S. at 326, 45 S.Ct. at 109.
 

 We hold that the same conclusion is appropriate in the present case. Garman clearly filed the financial statements for the purpose of obtaining credit. The financial statements were materially false when they were filed. Finally, the creditor extended credit upon the faith of the statements.
 

 The district and bankruptcy judges were also concerned, however, with the fact that the Northern took no steps to confirm or verify the information Garman set forth in his financial statements. They found, therefore, that any reliance the Northern placed in these statements was unreasonable. In
 
 Carini, supra,
 
 this court faced a similar contention and rejected it, as we do here.
 
 Carini
 
 involved a creditor who had the opportunity to verify the representations of the debtor’s solvency made by the debtor in a written statement, and by the debtor’s accountant orally. The creditor declined the opportunity “because he and [the debtor] were like brothers, and even had he seen [the verification], he would not have been able to understand [it].”
 
 In re: Matera,
 
 436 F.Supp. 947, 949 (E.D.Wis.1977). Nevertheless, this court affirmed the bankruptcy and district judges’ refusal to discharge the debt, stating: “Taking into account . .. the close friendship between .the parties, . .. the repetition of the false representations over a six month span, and the other circumstances prior to the loan, the finding of reasonable reliance is supported by the evidence.” 592 F.2d at 381. In the present case, we hold that the failure of the Northern to verify the information contained in Garman’s statements was not so unreasonable as to justify a finding that there was no actual reliance. Garman was a longtime customer of the bank and repeated his alleged misrepresentations over a three-year period. The statements themselves contain no information indicating that further investigation may be required, nor is there any allegation that further investigation would have uncovered the great majority of unlisted claims that were attributable to informal and oral arrangements between Garman and his friends. Furthermore, although a creditor is not en
 
 *1260
 
 titled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification. “The law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the latter to assume that he will do so”
 
 Jacobsen
 
 v.
 
 Whitely,
 
 138 Wis. 434, 120 N.W. 285, 286 (1909). Absent any facts reasonably indicating verification was necessary, we are not persuaded that the Northern’s failure to verify rendered its reliance so unreasonable as to discharge Garman’s debt.
 

 One further point deserves mention. On appeal, the district court affirmed,
 
 inter alia,
 
 the bankruptcy judge’s determination that because the November 1, 1973 renewal note extinguished all prior notes signed by Garman, the only circumstances to be evaluated under § 17(a)(2) were the circumstances surrounding the last renewal. To adopt such a position, however, is to hold that because the Northern failed to discover Garman’s misrepresentation at the time of the renewal, all prior alleged misrepresentations by Garman were excused. This we refuse to do. Although the renewal note did, in fact, result in the repayment of the prior notes for bookkeeping purposes, it is clear that in actuality the “renewal” was exactly what its name implies, an extension of the time in which Garman was required to repay the pre-existing debt. Garman’s counsel acknowledged this when he conceded at the oral argument that the $30,000 renewal and the prior notes were all part of the same loan transaction.
 

 Similarly, the fact that the November 1, 1973, renewal was initiated by the Northern rather than Garman is irrelevant to the instant issue. The fact remains that Gar-man signed financial statements stating that they could be relied upon until he informed the Northern otherwise. He cannot avoid liability on these statements simply because the Northern found that renewing the debt rather than immediately seeking its judicial remedies was in its interest. The Northern properly pleaded and appealed its contentions regarding the whole of Garman’s outstanding debt, and the district court, therefore, improperly limited its review to only those circumstances surrounding the November 1, 1973 renewal.
 

 Having held that the bankruptcy and district judges applied an improperly stringent legal standard in this case in finding that the Northern’s reliance was “unreasonable,” and therefore did not justify a bar to discharge, we see no reason to rule upon whether the bankruptcy judge’s finding that Northern failed to meet the more stringent standard was to be reviewed under the “clearly erroneous” or some other standard. Our determination turns simply on a question of law.
 

 Having thus determined that a reversal is necessary, our only remaining question concerns what course further judicial attention to this case should take. We have already set forth that the elements adverted to in
 
 Gerdes
 
 exist without dispute in the record of this case. The remaining question is the matter of “intent to - deceive.” We find guidance in
 
 Carini, supra,
 
 592 F.2d at 380:
 

 In addition, the courts require a showing of fraudulent intent or moral turpitude on the part of the debtor, i. e., an intent to deceive.... These questions of knowing or reckless falsehood and intent to deceive are questions of fact, ... and the bankruptcy court’s findings on those issues are conclusive unless clearly erroneous, ... (Citations omitted.)
 

 Here, of course, we are not aided by a finding on this question of fact. Nevertheless, in view of the inherent incredibility of Garman’s testimony, which we have previously noted, the continuing omissions in the context of the representations of completeness in the financial statements, in the words of
 
 Carini, supra
 
 at 380, “were grossly reckless at a minimum ... Indeed, where, as here, a person knowingly or recklessly makes a false representation which the person knows or should know, will induce an
 
 *1261
 
 other to make a loan, intent to deceive may logically be inferred.”
 
 Id.
 
 Here, we discern no reason for further extending the life of this litigation.
 

 Accordingly, the judgment of the district court is reversed and the cause is remanded for the entry of a judgment in favor of the Northern Trust Company. Costs will be assessed against the defendant.
 

 On Rehearing
 
 *
 

 This case is before the court on the petition for rehearing and suggestion for rehearing en
 
 banc
 
 filed in the above-entitled cause by Ben F. Garman, the defendant-appellee.
 

 The court further
 
 [10]
 
 notes a question as having been raised in the petition for rehearing as to the propriety of the judgment of this court in ordering a remand for an entry of a judgment in favor of the Northern Trust Company. For the reasons stated in the opinion of the court, under the circumstances of this case the relief was, and still is, deemed appropriate. For precedent for comparable action in this circuit
 
 see McKey v. Roetter,
 
 114 F.2d 129 (7th Cir. 1940),
 
 cert. denied,
 
 311 U.S. 691, 61 S.Ct. 72, 85 L.Ed. 447.
 

 On further consideration of the petition and suggestion for rehearing
 
 en banc,
 
 no judge in active service having requested a vote thereon and both of the judges on the original panel who are still in active service having voted to deny rehearing, accordingly,
 

 IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.
 

 [1]
 

 . There is no requirement that the creditor place exclusive reliance on the financial statement. Partial reliance is sufficient. See
 
 Carini v. Matera,
 
 592 F.2d 378 (7th Cir. 1979);
 
 Cunningham v. Elco Distributors,
 
 189 F.2d 87 (6th Cir. 1951).
 

 [2]
 

 . Garman’s transactions with the Northern can be summarized in the following schedule:
 

 Date Amount Date of statement relied upon Amount of claims omitted
 

 1. 12/ 9/70 $ 5,000 (loan) 12/ 8/70 $49,800
 

 2 12/21/71 $ 4,000 (loan) 12/ 8/70 $49,800
 

 3. 9/ 5/72 $ 7,500 (loan) $ 2,500 (renewal) 12/22/71 $51,170
 

 4. 1/15/73 $15,000 (loan) 12/22/71 $51,170
 

 5. 3/ 2/73 5,000 (loan) 2/27/73 $51,170
 

 6. 11/ 1/73 $30,000 (renewal) 2/27/73 $51,170
 

 [3]
 

 . Although King, unlike Bishop, did not specifically state that she had “relied” upon Garman’s filed statements when approving the renewal, she did state she had “reviewed” the statements and Garman’s credit file as a whole prior to granting her approval. Her reliance on the statements, which at the very least was a partial basis of her decision, is implicit in her testimony.
 

 [4]
 

 . As noted above, Bishop’s testimony that he actually relied on the statements in making the loans was direct and unimpeached, and the bankruptcy judge stated “there is no reason to doubt anything that Mr. Bishop stated in answer to the questions in my opinion.” .
 

 [5]
 

 . Section 523(a)(2)(B) of the Bankruptcy Act of 1978 provides, in relevant part:
 

 A discharge under .. . this title does not discharge an individual debtor from any debt —... for obtaining money .. or an extension [or] renewal, ... by — ... use of a statement in writing — (i) that is materially false; (ii) respecting the debtor’s ... financial condition; (iii) on which the creditor to whom the debtor is liable for obtaining such money . . . or credit
 
 reasonably
 
 relied; and (iv) that the
 
 *1256
 
 debtor caused to be made or published with intent to deceive .... (Emphasis added.)
 

 [6]
 

 . Whether the new § 523 will be subject to the same interpretation we apply today to § 17(a)(2) is a question that will have to await another day for resolution.
 

 [7]
 

 . Although it is true Garman was in default on at least one of the loans at the time of the November 1, 1973 renewal, this does not necessarily indicate that the financial statement misrepresented his financial condition. This fact might well indicate that it was a poor business decision to grant the renewal at that time in that Garman apparently would be required to sell assets to repay his debt.
 
 See
 
 discussion in text,
 
 infra.
 
 However, whether or not it was a poor business decision is not the proper inquiry. Rather, the proper inquiry is whether the claimed reliance on the financial statement accurately to portray Garman’s net worth in excess of the debt was so unreasonable as not to be reliance in fact.
 

 [8]
 

 . An excerpt from the transcript of the bankruptcy hearing is indicative:
 

 The Court: The way I look at reliance if you rely on a piece of paper than it has to be that you are able to make a proper business decision
 

 [[Image here]]
 

 What if I think the person who relied on [the statement] is a complete fool?
 

 * * * * sje *
 

 
 *1258
 
 Mr. Webb (Northern’s counsel): Therefore, there is no question that the financial statement was relied upon. Now whether or not she should have relied upon it is the question your honor is asking?
 

 The Court: Yes ... I say that is
 
 bad judgment.
 

 * * * * * *
 

 Mr. Webb: But the bank did rely upon it.
 

 The Court: Then I fault their judgment. I fault their reliance ... and I think that it is bad judgment if they relied upon this, even partially relied upon this.
 

 * * * * * *
 

 The Court: The statement dated 2/27/73 does not justify the renewal or extension of credit to Mr. Garman of $30,000....
 
 It is just bad business conduct.
 

 * * # Sfc Sfc sk
 

 The Court: I find it difficult to impose on Mr. Garman the responsibility of the bank’s actions in making these loans where I believe that the various statements supposedly relied upon [by] the bank do not warrant in the court’s opinion the extension of the credit....
 

 (Emphasis added.)
 

 [9]
 

 . At one point the bankruptcy judge stated:
 

 Then I look to the financial statement and I say how can anyone look at this personal financial statement .. . which is the one dated February 27, and say on April 30, 1974 [the due date of the renewal note] Ben F. Garman will be able to pay $30,000.
 

 * * * * * *
 

 Where is he going to get that money? He has $80,000 in_he is not going to sell his house. His cash in the bank, what is he going to do with that? He will keep that. He has life insurance cash value. Okay. On the back of it he says he has a loan of $5,000. Will he get another loan? All right, there is $5,000. He has a car. Is he going to sell his car? His coin collection. Are we going to ask him to sell his coin collection? He probably will not.
 

 A lot, $20,000. I do not know what that lot is, whether it is a new home or an old home.
 

 *
 

 Circuit Judge Philip W. Tone was a member of the panel which decided this case. However, Judge Tone resigned as a member of this court effective April 30, 1980.
 

 [10]
 

 . On its own motion, the court excised a sentence from the original opinion.