In re William R. BLATZ, Mary Jo Blatz, Debtors.

REGENCY NATIONAL BANK, Plaintiff,

v.

William R. BLATZ, Defendant.

Bankruptcy No. 82–02897.
Adv. No. 82–1531.

United States Bankruptcy Court,
E.D. Wisconsin.

Feb. 7, 1984.

James S. Grodin, Grodin & Grodin, Milwaukee, Wis., for plaintiff.

Roland J. Steinle, III, Milwaukee, Wis., for debtor-defendant.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

An adversary proceeding was commenced by Regency National Bank ("the Bank") against the debtor, William R. Blatz, ("Blatz") seeking to declare a debt nondischargeable in the amount of $51,600.00 together with accumulated interest. This obligation was evidenced by a promissory note dated June 30, 1982. The claim of nondischargeability is premised upon an alleged false financial statement prepared by Blatz and submitted to the Bank, pursuant to § 523(a)(2)(B) of the Bankruptcy Code.[1]

## FACTS

Greg Hoppe ("Hoppe"), a business associate of Blatz, attempted to borrow funds from the Bank for use as working capital in Sonn Line Trucking, Inc. ("Sonn Line"). Sonn Line was a trucking business formed by Blatz and operated by both Blatz and Hoppe. As part of the proposed loan, Hoppe informed the Bank that Blatz would sign a guarantee. Hoppe had been a customer of the Bank before this loan application was submitted and was already delinquent on an existing $21,600.00 obligation to the Bank causing the Hoppe loan to be termed as a "classified" loan. This in banking parlance meant it was considered a substandard loan. Because of this situation, the Bank rejected the new loan application. In May or June of 1982, Hoppe introduced Blatz to Laurence Stanul ("Stanul"), the Bank's chief lending officer. Stanul testified at the trial that he had been favorably impressed by Blatz and was receptive to Blatz's offer to obtain a direct loan from the Bank in the amount of $51,600.00. This loan would not only include $30,000.00 in fresh cash, but would also involve taking over the $21,600.00 obligation due to the Bank from Hoppe. Blatz informed Stanul that he was willing to take over Hoppe's loan because he "needed Hoppe in the Sonn Line business" venture and that "Hoppe had all the connections in order for me to grow in my venture." Shortly after this meeting, and at the Bank's request, Blatz submitted to the Bank a financial statement dated May 20, 1982. Blatz also informed Stanul that he expected to pay for the loan balance from funds he anticipated receiving as a "syndicator's fee" for his role in obtaining investors in a pending apartment project in Houston, Texas. Stanul then conferred with Robert Aiken, a Bank consultant, and requested that Aiken obtain more information regarding the Texas apartment project. Following a meeting with Blatz, Aiken submitted a favorable report to Stanul on this project. Stanul contacted officials of three banks listed on Blatz's financial statement. He also checked with a credit bureau in order to obtain a reading on Blatz's credit history. Favorable responses were received from the three banks and nothing of a negative nature was derived from the credit bureau. Stanul testified he assumed the information contained within Blatz's financial statement was correct and that he had no reason to doubt its authenticity. He further claimed

1. § 523. Exceptions to discharge.
 (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
 (2) for obtaining money, property, services, or an extension renewal, or refinance of credit, by—
 (B) use of a statement in writing—
 (i) that is materially false;

 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive;

he would not have made the loan without securing this financial statement and that he relied upon it in reaching the decision to make this loan. He also said that while the name "Blatz" is prominent in the community, it was not a factor in influencing the Bank's judgment with regard to making the loan.

On June 30, 1982, Blatz signed a single payment unsecured promissory note for $51,600.00 to the Bank. It was payable in 120 days with interest at the rate of 18 per cent. On that same date, Hoppe was released from his obligation to the Bank for $21,600.00, and this obligation was removed from its books.[2]

A check in the sum of $30,000.00 was given by the Bank and made payable to Blatz.

On August 26, 1982, (before the note became due), Blatz filed a petition for relief under Chapter 11 of the Bankruptcy Code. Around that same time, the Texas apartment project was consummated. However, no "syndicator's fee" was paid to Blatz, since Blatz had been unable to obtain investors. This was due to problems which arose regarding compliance with provisions of the Wisconsin securities laws and which caused the Texas developers to obtain their financing elsewhere.

## LAW

In reaching a determination as to whether the debt or any portion of it from Blatz to the Bank is excepted from discharge under § 523(a)(2)(B), the Court must be satisfied as to the presence of all of the following elements: (1) the existence of a statement in writing; (2) that is materially false, (3) respecting the debtor's financial condition; (4) upon which the creditor reasonably relied; and (5) that the debtor made with intent to deceive.

The following comparison of certain portions of Blatz's financial statement dated May 20, 1982, which was submitted by him to the Bank and was represented by Blatz as his then financial condition with comparable portions of his bankruptcy schedules which purported to be his financial condition as of August 26, 1982, is informative.

| | FINANCIAL STATEMENT (AS OF MAY 20, 1982) | CHAPTER 11 BANKRUPTCY SCHEDULES (AS OF AUGUST 26, 1982) |
|---|---|---|
| ASSETS: | | |
| Interest in Sonn Line | $ 315,000 | NO VALUE |
| Interest in W. R. Blatz Associates | 120,000 | NO INTEREST [3] |
| Partnership Interests | 898,000 | $ 608,000 [4] |
| LIABILITIES: | | |
| Unpaid Income Taxes | 3,000 | 200,000 |
| Secured and Unsecured Notes (Payable to Banks and other parties) | 475,000 | 643,600 |
| NET WORTH: | $1,448,750 | ($2,469,706) |

---

**2.** Although Hoppe was released from personal responsibility on this note, he did sign a statement in which he agreed to have his 1979 Mercury automobile remain as collateral for the loan to Blatz.

**3.** This was an asset belonging to Blatz's wife. When Blatz was asked at the trial why he had not explained his wife's interest in the venture in his financial statement, he responded that nobody questioned him about it.

**4.** This value takes into account certain additional partnership presently not listed in the bankruptcy schedules, but which Blatz stated would be included in an amendment to be filed by him in the future.

These discrepancies between the financial statement and the bankruptcy schedules filed approximately three months later are major and cannot be attributed to a lack of sophistication or understanding on Blatz's part. He is an individual with considerable experience in the preparation of financial statements, having, by his own acknowledgement, prepared approximately 20 other financial statements over the past five years. He is a college graduate with an economics degree from the University of Wisconsin. He has also had extensive experience in the fields of real estate, insurance and securities. He is licensed in each of these fields and has been involved in real estate acquisitions and in the syndication of limited and general partnerships.

 From the evidence presented, it is clear that Blatz's financial statement is so replete with significant errors as to constitute, at a minimum, gross recklessness. Where a person knowingly or recklessly makes a false representation which that person knows or should know would induce another to make a loan, intent to deceive may logically be inferred. *Matter of Garman,* 643 F.2d 1252 (7th Cir.1980); *Carini v. Matera,* 592 F.2d 378 (7th Cir.1979). Although fraud used in the context of excepting a debt from discharge means "positive fraud involving moral turpitude" such fraud may be implied if the totality of the circumstances so required. In *In re Schlickmann,* 6 B.R. 281 (Bkrtcy.D.Mass.1980) the court states, at 282:

> "Direct proof of fraudulent intent is rarely available. Therefore, intent to deceive may be inferred when the totality of the circumstances presents a picture of ·deceptive conduct by the debtor which indicates that he did intend to deceive and cheat the lender. The representation coupled with his conduct is sufficient to permit the court to infer the requisite intent."

 After taking into consideration Blatz's background and the magnitude of the inaccuracies contained in the financial statement, this Court is satisfied that a written financial statement was submitted which was materially false and which was presented by Blatz with the specific intent of deceiving the Bank in order to obtain a loan. Therefore, four of the five necessary elements needed to establish an exception to discharge under § 523(a)(2)(B) have been satisfied.

The Court next directs its attention to the final prerequisite element—reasonable reliance by the Bank. There is no question but that the Bank could have conducted a more thorough and prudent investigation than was in fact performed in this case. No more than a total of one hour was spent in analyzing Blatz's financial statement and in contacting the representative of three banks and a credit bureau. There was no request by the Bank for any audited financial statement or that it at least be prepared by an independent accountant. There was total reliance upon Blatz regarding the details of the Texas apartment project. There does not appear to have been any attempt to contact any other parties involved in this venture. This investigation appears to have been extremely casual under· these circumstances particularly with Blatz being a new Bank customer with no history of past satisfactory financial dealings. However, the fact that the Bank should have been more cautious does not necessarily require a finding that it did not reasonably rely upon Blatz's financial statement. The statement itself contained within it information furnished by Blatz which was sufficient to provide the Bank with a full and complete picture of his financial condition. The evidence in the record is devoid of any proof that the Bank had any independent knowledge that the information in the statement was materially false. Simply because the Bank did not in all respects verify the authenticity of the information submitted does not mean that it had not reasonably relied upon it. The Bank did not, as was stated in the case of *In re Hunt,* 30 B.R. 425, 450 (Bkrtcy.M.D.Tenn. 1983) (quoting from *In re Yeiser* 2 B.R. 98, 101 (Bkrtcy.M.D.Tenn.1979)) "assume the position of an ostrich with its head in the sand and ignore facts which were readily

available to it". In *Hunt,* no questions were asked concerning any of the information contained within the statement. In dealing with Blatz, the Bank at least made some effort by contacting representatives of three banks and a credit bureau. Nothing in its investigation suggested that the statement was false. The extent of the Bank's investigation in verifying the information only has a bearing on the Bank's internal procedures and not on its reasonable reliance. In *Garman, supra,* the court, in interpreting the meaning of "reasonable reliance" states as follows, 643 F.2d at 1258:

"The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact. Given this reliance, the court, with the benefit of hindsight, should not base its decision regarding discharge on whether *it* would have extended the loan. In the present case, the (bank's) financial statement form requested sufficient information to obtain an accurate picture of the debtor's net worth, a reasonable decisional factor in the loan decision. To say the (bank) should have looked to the (debtor's) income flow instead of net worth is irrelevant to § 17(a)(2) issues". (*Garman,* 643 F.2d at 1258).

"—although a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification. 'The law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the latter to assume that he will do so—' *Jacobsen v. Whitely,* 138 Wis. 434, 120 N.W. 285, 286 (1909). Absent any facts reasonably indicating verification was necessary, we are not persuaded that the (bank's) (failure to verify rendered its reliance so unreasonable as to discharge (debtor's) debt." (*Garman,* 643 F.2d at 1260).

Although *Garman* dealt with the meaning of "reasonable reliance" under § 17(a)(2) of the Bankruptcy Act, the Seventh Circuit thereafter extended this reasoning and has applied it to the successor provision of § 523(a)(2)(B) of the Code. In *In re Kreps,* 700 F.2d 372 (7th Cir.1983), it was held that reasonable reliance was not intended as an invitation to "second guess" a creditor's decision to make a loan or set loan policy for the creditor. Similarly, in the instant case, the matter of policing its procedures is for the Bank and not for this Court to regulate.

This Court recognizes that Blatz was taking over a problem loan which the Bank was not reluctant to remove from its books. This undoubtedly was an important factor in the Bank's decision to approve the loan to Blatz. Nevertheless, there is no requirement that a creditor must place *exclusive* reliance upon the debtor's financial statement in making a loan. Partial reliance is sufficient. *In re Garman, supra,* 643 F.2d 1252 n. 1; *In re Coughlin,* 27 B.R. 632 (Bkrtcy.App.Mass. 1st Cir.1983); *In re Tomei,* 24 B.R. 204 (D.C.W.D.N.Y.1982). From the evidence presented, the Bank gave the financial statement more than perfunctory treatment.

This Court is accordingly satisfied that all of the elements necessary to sustain an exception under § 523(a)(2)(B) have been established.

The consequences flowing from Blatz's false financial statement must also be analyzed in order to determine the appropriate measure of nondischargeable damages. While the face amount of the promissory note which Blatz signed was in the sum of $51,600.00, $30,000.00 of this amount was fresh cash. The balance of $21,600.00 was an obligation which had been assumed by Blatz from a prior obligor.

■ In a tort action, an injured party is entitled to recover such damages as result directly, naturally and proximately from the fraud. 37 Am.Jur.2d Sec. 343 *Fraud and Deceit.* The case of *Danns v. Household Finance Corp.,* 558 F.2d 114 (2d Cir. 1977) is authority for the principle that only a portion of the creditor's loan which resulted from the fraud is nondischargeable. 558 F.2d at 116:

"There is nothing in the legislative history of the 1960 Amendments (to the Bankruptcy Act) to indicate a Congressional intent that a bankrupt should be penalized for more than simply the consequences of its fraud."

What must therefore be determined are the consequences of Blatz's false financial statement. While it is clear that Blatz's statement had a direct impact upon the Bank's decision to provide Blatz with $30,000.00 in cash, the additional consequence of Hoppe being released and Blatz substituted for his loan presents an entirely different situation. When Blatz assumed Hoppe's loan, for all intents and purposes it was considered by the Bank as an opportunity to work itself out of a bad predicament. There was no actual reliance by the Bank upon Blatz's financial statement with respect to this portion of the transaction. The Bank had already at that point viewed Hoppe's loan as uncollectible. Stanul testified that the Bank had "already taken it on the chin" regarding Hoppe's loan. *Matter of Chambers,* 23 B.R. 206 (Bkrtcy.W.D.Wis. 1982), Judge Martin held that only the "fresh cash" advanced to the debtor was nondischargeable and concluded that the creditor should be entitled to only bar a discharge of that portion of his loan which was obtained fraudulently. This Court has also recognized this principle in the case of *Matter of Thomas,* 21 B.R. 553 (Bkrtcy.E.D. Wis.1982) (affirmed, 33 B.R. 109 (D.C.E.D. Wis.1983)). Although *Thomas* involved defalcation by a fiduciary within the meaning of § 523(a)(4) of the Code, it is consistent to apply the same rationale to § 523(a)(2)(B).

Finally, the Court recognizes that when Hoppe's loan was initially made, his 1979 Mercury automobile was pledged as collateral and remained as collateral even after Blatz assumed this obligation (*see,* n. 2). Under these circumstances, since the security involved was an integral part of the original loan to Hoppe and in no way connected with the $30,000.00 "fresh cash", any proceeds either received or hereafter to be received by the Bank from the sale of this automobile shall be credited against the dis-

chargeable portion of Blatz's obligation to the Bank.

CONCLUSION

The Bank has therefore established by the evidence submitted that Blatz made a materially false statement regarding his financial condition upon which it relied to the extent of $30,000.00 together with accumulated interest of $843.00, for a combined sum of $30,843.00 and that the financial statement was made with the intent to deceive, thereby rendering this amount to be nondischargeable. The balance of the obligation from Blatz to the Bank is dischargeable.

This decision shall stand as and for findings of fact and conclusions of law in accordance with Rule 752 of the Federal Rules of Bankruptcy Procedure.