**In re Charlie G. KIM, etc., et al., Debtors.**

**MERRILL LYNCH BUSINESS FINANCIAL SERVICES, INC., Plaintiff,**

v.

**Charlie G. KIM, etc., et al., Defendants.**

**Bankruptcy No. LA 90–00767–GM. Adv. No. LA 90–0651.**

United States Bankruptcy Court, C.D. California.

April 9, 1991.

Dave Lenny, Calabasas, Cal., for plaintiff.

Richard M. Moneymaker, Moneymaker & Kelley, Los Angeles, Cal., for defendants.

## MEMORANDUM OF OPINION

GERALDINE MUND, Bankruptcy Judge.

Merrill Lynch Business Financial Services, Inc. filed a complaint objecting to dischargeability of its debt pursuant to 11 U.S.C. § 523. The matter came on for trial on December 14, 1990. Dave Lenny, Esq. appeared on behalf of Merrill Lynch Business Financial Services, Inc., and Richard M. Moneymaker of Moneymaker and Kelley appeared on behalf of debtor. The Court, having heard testimony and received evidence, gave judgment for Kyong Kim and took the matter under advisement as to Charlie G. Kim and requested further brief-

ing. The Court hereby issues its findings of fact and conclusions of law by virtue of this *memorandum of opinion.*

## FACTS OF THE CASE

In November, 1988, Charlie G. Kim ("Kim") applied for a loan to be used for Emille Paper and Chemical Company, of which he was the sole proprietor. He completed the loan application forms and had his wife (who speaks little English) also execute them. The loan application was made to Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch") who approved the loan, which was to be secured by accounts receivable and inventory of the business. In applying for the loan, Kim submitted the documents attached as Exhibit "A" to the Amended Complaint, which included three years' worth of Federal income tax returns, business financial statements, profit and loss statements, personal financial statements, and a list of accounts receivable as of August 31, 1988. Merrill Lynch, based upon these documents, granted the debtors a line of credit of up to $100,000.00.

Kim used the line of credit and by June, 1989, debtor had missed several monthly payments. Consequently, on July 6, 1989, Merrill Lynch advised Kim that the line of credit was suspended and requested that he arrange for alternate financing from another source.

On August 10, 1989, there was a meeting between Kim and Gregory Scheiner (of Merrill Lynch) and Ted Kopczynski (of Merrill Lynch) at which time Kim admitted that he had submitted false information in obtaining these loans—specifically the tax returns, accounts receivable listing, aging schedule, etc. An agreement was reached between Kim and Merrill Lynch that there would be a 15–month payback of the loan at the rate of $2,000.00–$5,000.00 per month. The terms and conditions of this agreement are outlined in the letter of August 18, 1989 (Exhibit "A" to the Amended Complaint). This agreement required, among other things, that Kim would grant Merrill Lynch a third deed of trust on his home and specified that the aggregate out-standing loan balance secured by the first and second deeds of trust would not exceed $295,000.00. Kim signed and returned this letter.

On September 7, 1989, Merrill Lynch again confirmed the agreement in writing and noted, "This is not an accord and satisfaction. Neither the execution of this agreement nor anything contained in the previous Letter Agreement, will affect any of your Obligations to MLBFS which are unconditional and absolute. Furthermore, nothing contained in any Agreements between us shall be deemed or construed to be a waiver of MLBFS's right to undertake any legal action hereafter, based upon the previous misrepresentation of your financial condition or any subsequent Default under the WCMA." This letter was signed and returned by Kim and his wife along with a deed of trust and assignment of rents on the house.

On January 11, 1990, Charlie Kim and Kyong Kim filed this bankruptcy under Chapter 7. Merrill Lynch brought the current adversary proceeding. In their bankruptcy schedules, the Kims claim that the house has a market value of $400,000.00, with the following claims against it: a first deed of trust to World Savings in the amount of $268,970.09, a second deed of trust to Security Pacific Financial Services in the amount of $27,793.10, and a third deed of trust to Merrill Lynch with a balance due of $91,199.09.

The bankruptcy file also shows that on April 12, 1990, the Court entered its order for relief from the automatic stay in favor of World Savings and Loan, holder of the first deed of trust, based on the declaration of Keith Lucas that the total owing to World Savings is $278,878.04 ($268,970.09 being the unpaid principal balance and the rest is due to arrearage payments and attorneys' fees), and that the subject property has a fair market value of $300,000.00. Pursuant to Mr. Lucas' declaration, there is no equity for the holder of the third deed of trust.

## FINDING OF FRAUD

Although fraud was not admitted by the debtor, the Court found at time of trial that

Kim did supply materially false tax returns and financial statements to Merrill Lynch in obtaining the 1988 loan for his business. The only issue remaining before the Court is whether the August and September, 1989 transactions constitute a new extension of credit and whether they excuse the debtor from the prior fraud because Merrill Lynch knew of the prior fraud at the time that it rewrote the loan.

### THE NATURE OF THE 1989 AGREEMENT

Both counsel struggle with the issue of what relationship exists between the 1989 agreement and the 1988 one. Debtor claims that it is an accord and satisfaction, although the September letter specifically states that this is not the case. Debtor argues that the Kims could not possibly understand the restrictive language of the 1989 agreement and that they intended it to be an extinguishment of the prior debt. Merrill Lynch asserts that it never intended the 1989 agreement to be an accord and satisfaction and that the agreement so states.

California Civil Code § 1521 defines "accord" as: "an accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled." Under this definition, the critical issue is whether Merrill Lynch agreed to accept the time payments as an extinction of the prior obligation; it is not whether the Kims intended to extinguish the prior obligation.

■ It might be argued that Merrill Lynch's statement about accord and satisfaction is an after thought, has no effect because it came after the documents were signed, and cannot be used to show that on August 18 Merrill Lynch did not intend an extinguishment of the prior obligation. However, factually this is not the case. When Kim signed the first agreement letter (8/18), the transaction was not complete. The second agreement letter (which was also signed by Mrs. Kim) contained the statement about accord and satisfaction and at that point the Kims were still required to sign the deed of trust as well as

the second letter. This Court therefore finds that Merrill Lynch did not intend to extinguish the 1988 obligation and no accord and satisfaction occurred.

■ Although no one argues novation, cases in this area do discuss it. *See In re Roberts,* 54 B.R. 765 (Bankr.D.N.D.Colo. 1985). "Novation" is defined in California Civil Code § 1530 as "the substitution of a new obligation for an existing one." Section 1531 makes it clear that the substitution must be with intent to extinguish the old obligation. As stated above, the Court cannot find that Merrill Lynch had an intent to substitute the new obligation for the prior one.

■ This Court finds that the 1989 agreement was a modification or forbearance agreement. Both require consideration. In this case the consideration is that Merrill Lynch was allowing repayment over time and for that it was receiving a deed of trust, which appears to have had some value at the time given but may now be valueless.

### LEGAL EFFECT OF THE 1989 AGREEMENT

■ The general rule is that all debts are dischargeable unless specifically excepted. The Bankruptcy Code excepts from discharge "any debt ... for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by ... (B) use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive ..." 11 U.S.C. § 523(a)(2)(B). The creditor has the burden of proving each element by a preponderance of the evidence. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ The first question is whether the balance owed Merrill Lynch is a "debt." The term "debt" is defined in 11 U.S.C. § 101(11) as "liability on a claim." A

"claim" is broadly defined in 11 U.S.C. § 101(4)(A) to include "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured...." It is clearly the intent of the Bankruptcy Code that almost any type of monetary obligation of the debtor should be considered a "debt." The Court finds that Kim's obligation to Merrill Lynch is a debt.

■ Clearly the initial extension of credit, which was fraudulently obtained, is non-dischargeable under § 523(a)(2)(B). If the initial extension of credit is replaced or extinguished by the 1989 loan agreement, then the debt would be dischargeable because the only claim that remains is on the 1989 agreement. As set forth above, under California law the Court finds that the 1989 agreement was an extension of the prior loan, a modification, or a forbearance. The legal effect is the same in all three situations—the 1988 loan is not extinguished.

However, a determination under § 523 is made in terms of the bankruptcy law, not of state law.

■ Most of the bankruptcy cases that involve renewal or forbearance concern a situation where the original loan was without fraud but there was an intervening conversion or fraud occurred when the debtor renewed the obligation. There are few cases, like this, where the creditor has been generous enough to the defrauding debtor to allow a new agreement and then bankruptcy was filed.

*In the Matter of Garman,* 643 F.2d 1252 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), concerned a debtor who executed a series of notes to Northern Trust Bank, creating a total indebtedness of $30,000.00. In support of these loans, the debtor gave Northern three financial statements which were materially false. Thereafter Northern renewed the notes into a single loan, which was given with no new financial informa-

tion, although the most recent financial statement was over seven months old. Garman defaulted on the loan and filed bankruptcy. In determining the effect of the renewal note under the Bankruptcy Act, Section 17(a)(2)[1], the Seventh Circuit stated as follows:

"One further point deserves mention. On appeal, the district court affirmed, *inter alia,* the bankruptcy judge's determination that because the November 1, 1973 renewal note extinguished all prior notes signed by Garman, the only circumstances to be evaluated under § 17(a)(2) were the circumstances surrounding the last renewal. To adopt such a position, however, is to hold that because the Northern failed to discover Garman's misrepresentation at the time of the renewal, all prior alleged misrepresentations by Garman were excused. This we refuse to do. Although the renewal note did, in fact, result in the repayment of the prior notes for bookkeeping purposes, it is clear that in actuality the 'renewal' was exactly what its name implies, an extension of the time in which Garman was required to repay the preexisting debt. Garman's counsel acknowledged this when he conceded at the oral argument that the $30,000 renewal and the prior notes were all part of the same loan transaction.

"Similarly, the fact that the November 1, 1973, renewal was initiated by the Northern rather than Garman is irrelevant to the instant issue. The fact remains that Garman signed financial statements stating that they could be relied upon until he informed the Northern otherwise. He cannot avoid liability on these statements simply because the Northern found that renewing the debt rather than immediately seeking its judicial remedies was in its interest." 643 F.2d at 1260.

*In re Liming,* 797 F.2d 895 (10th Cir. 1986), involved a fact situation similar to the instant matter. In *Liming,* the debtor obtained a $15,000.00 loan from the Central National Bank of Enid, Oklahoma. The

---

**1.** *This is essentially identical to § 523(a)(2) of the Bankruptcy Code.*

debtor submitted false financial information at the time he obtained the loan. Shortly thereafter, the debtor gave Central National a revised financial statement, disclosing the fraud. Central National did not call the loan, but rather accepted a $3,000.00 payment on the existing debt and a renewal note on the balance at a lower rate of interest. Approximately eight months later the debtor filed for bankruptcy. The 10th Circuit held that the entire debt was nondischargeable under 11 U.S.C. § 523(a)(2)(B). The Court reasoned that even though Central National did not rely on the financial statement when it issued the renewal note, the debt is still nondischargeable since "[t]he renewal only maintained [the debtor's] initial debt, which was incurred in reliance on [the debtor's] initial false statement. It did not represent a new debt incurred without regard to the initial false statement.... [T]he issuance of the renewal note showed Central National's great concern over [the debtor's] false financial statement. It represents its attempt to make the best of a bad situation." 797 F.2d at 898.

The court went on to state the policy upon which it ruled favorably to the plaintiff: "We will not hold that the bank should have called the loan when it discovered the falsity of the financial statement in order to maintain its right to rely on the falsehood. Central National should not be penalized for accepting part payment and extending the date by which the loan must be repaid in an apparent effort to keep Liming afloat. A different ruling would frustrate the purposes of the bankruptcy law." *Id.*

The holding in *Garman* was limited to a situation in which the creditor renewed the obligation without any knowledge that the original loan had been obtained by fraud. Dicta in that case implies that if the creditor knew that the original loan had been obtained by fraud and still renewed it, that the debt might be discharged in a later bankruptcy. However the *Liming* case is right on point. This Court does not believe that Merrill Lynch should be penalized for "its attempt to make the best of a bad situation." Here, Merrill Lynch approved

the loan to the debtor based on the submission of false financial documents. It wasn't until the debtor defaulted under the loan agreement that the falsity was discovered. Instead of calling the loan, Merrill Lynch accepted a 15–month payback.

■ This Court can visualize circumstances in which the rewriting of a prior debt after fraud is discovered would be dischargeable. For example, if the debtor were highly creditworthy and had the ability to repay or refinance the prior debt but the creditor urged the debtor to renew the loan rather than pay it off, then the debt could be discharged. That is not the case before this Court.

■ The Court has looked closely at the transaction concerning the deed of trust on the house to see whether the taking of this collateral sufficiently changed the nature of the original loan so that the renewal could be considered substantively different from the original obligation. It does not appear that the facts bear this out. Although there was an agreement on amount of senior liens that would exist, it appears that the remaining equity was sufficiently low that the security given to Merrill Lynch was relatively de minimus. Therefore the facts of this case are not sufficiently distinguishable from those of *Liming* and this Court feels that the holding of the 10th Circuit is persuasive.

Thus, the debt to Merrill Lynch is nondischargeable in its entirety under 11 U.S.C. § 523(a)(2)(B) since the original loan was obtained by use of a statement in writing that is materially false respecting the debtor's financial condition, on which the creditor reasonably relied, and that the debtor caused to be made with intent to deceive. To hold otherwise would frustrate the intent and purpose of § 727 which was enacted to protect the "honest debtor" and not one who obtains financing based on deception. To hold otherwise would place an unfair burden on a lender who had foregone the opportunity to call the loan and therefore had provided the debtor with a second chance. To hold otherwise would greatly impede a troubled entity from ob-

taining an extension of credit or renewal of an existing loan.

Counsel for Merrill Lynch is to prepare a proposed judgment in this matter, lodge it and serve it on opposing counsel.