**In re Lisa FUTSCHER, Debtor.**

**James CORY, Plaintiff,**

**v.**

**Lisa FUTSCHER, Defendant.**

**Adv. No. 1–85–0202.**
**Related Case No. 1–85–00315.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

Dec. 26, 1985.

Charles E. Wilson, Cincinnati, Ohio, for debtor/defendant.

Jeffrey S. Bakst, Fairfield, Ohio, for plaintiff.

## DECISION

BURTON PERLMAN, Bankruptcy Judge.

Defendant herein is the debtor in the related Chapter 7 bankruptcy case. The complaint in this adversary proceeding asserts a claim of nondischargeability of a debt owed to the plaintiff. The case came on for trial to the court at the conclusion of which we reserved decision. At the trial, defendant moved for judgment at the close of plaintiff's case, and we reserved decision on that motion as well. The claim asserted by plaintiff arises under 11 U.S.C. § 523(a)(2), plaintiff contending that the debt owed him is nondischargeable because the debt arose because money was obtained from plaintiff by fraud.

Defendant, Joseph Rump and Kenneth Ankenbauer, were each one-third partners in a partnership named Corvette of Cincinnati Company (hereafter "CCC"). The business of the partnership was the providing of automotive service, particularly relating to the servicing of Corvette automobiles. The partnership was created by an instrument which recited that it was executed on August 15, 1983, but in fact was executed about a week later. The transaction began upon the execution by one Wayne Hague of a handwritten instrument in which he said that he sold CCC to Joseph Rump, Kenneth Ankenbauer and Louis Kahn. Hague's signature was written close by where the date August 13, 1983 appeared. We are satisfied that the subsequent partnership agreement was executed approximately a week after the Hague sale document.

While Kahn was one of the original named transferees of CCC from Hague, he informed Rump and Ankenbauer that defendant would be the partner rather than himself, and Rump and Ankenbauer agreed. Kahn and defendant had a close personal relationship at this time. Additionally, Kahn was having personal difficulties which could have led to substantial liabilities. It was these facts which led to Kahn's substituting defendant as the third member of the partnership instead of himself.

From the time of acquisition, Kahn ran the day to day business. Rump and Ankenbauer were present from time to time, but their role did not involve them in day to day conduct of the business. As much as anything else, they came to the premises for the purpose of picking up payment checks for their respective interests in CCC.

At the beginning of January, 1984, because they were concerned about adverse publicity regarding Louis Kahn which was appearing in the press, Rump and Ankenbauer sold their interests in CCC, and defendant became the sole proprietor of CCC. Kahn was involved in this buy-out transaction, attending a conference about it. The arrangement was that Rump and Ankenbauer would be paid out over eleven months. Kahn continued to be present at the business, in charge of day to day affairs.

There came a time in about July, 1984 when Kahn terminated his active role in the operation of CCC, and left the city. Prior to that time he had hired Wayne Hague, from whom the business had been purchased, to work in the business. After Kahn left, Hague was the active manager of CCC. An incident occurred in July, 1984 when Rump and Ankenbauer met with defendant at the premises of CCC. At that time, defendant told Rump and Ankenbauer that she was suspicious of the honesty and integrity of Hague. Defendant throughout the period that she had ownership of CCC was employed full-time elsewhere.

The foregoing is a background against which the events involving plaintiff occurred. Plaintiff owns a Corvette. Finding it in need of repair, on recommendation of an acquaintance, he spoke to Kahn on the phone during the first week of June, 1984. He brought the car in for repair shortly thereafter. Both Kahn and Hague were present. Plaintiff dealt with Kahn.

Kahn told him that he needed certain parts which could be found within a week. Plaintiff authorized Kahn to proceed, saying that he would pay him when the parts came in. Pursuant to this understanding, on July 14, 1984, plaintiff paid CCC $500.00 for parts. Since the payment was just for the parts, and did not pay for work installing them in plaintiff's car, he was asked for further money. Plaintiff paid CCC $647.00 on July 20, 1984, such payment having been received by Kahn. Kahn then phoned plaintiff and told him that his car was ready. Plaintiff came to CCC and test drove the vehicle. At this point, he was dealing with Hague, for Kahn was not around.

The car was not satisfactory upon the test drive. Hague told plaintiff that the engine block was damaged and the car needed more work. Plaintiff then authorized Hague to locate a reconditioned 427 engine. Hague subsequently called plaintiff and said that he had succeeded in locating such an engine. Plaintiff paid CCC $1,500.00 on August 2, 1984 for such engine. It was understood that with that money Hague would purchase the engine and it would take him a day or two to install it. After a couple of weeks, plaintiff called Hague, but was told that the engine had not yet come to hand. In the third week of August, 1984, in response to plaintiff's further inquiry, Hague told plaintiff that he had received the engine and had sent it out for reconditioning. Plaintiff, having gotten suspicious, called the company which was supposed to be reconditioning the engine and was informed that that company had not received any such engine and had not dealt with CCC for some time. At that point, plaintiff contacted counsel. On August 31, 1984, counsel wrote a letter to CCC on behalf of plaintiff. Plaintiff then went to the CCC premises. He had a conversation with Hague which went on for some time. He demanded satisfaction of Hague. Defendant was present at CCC when this conversation occurred. She did not participate in it. She did break into the conversation to inform Hague that she was leaving the premises.

From the foregoing, it is clear that all of the misrepresentations which were made, and any fraud which occurred, emanated from Wayne Hague. Defendant never had any conversation with plaintiff, nor was there any evidence whatever that she personally participated in the transaction between plaintiff and CCC. She was, however, the owner of CCC at the time of the transaction with plaintiff. (We decline to consider whether defendant should be excused from liability because she was merely a "front" for Kahn. It is undisputed that she was the record sole proprietor of the business. She must accept the consequences of that fact). The record is entirely bare of any participation by defendant in the fraud.

Having found the preceding facts, we must examine and decide what law is applicable to them. On the one hand, plaintiff suggests that the law is that a debtor will be bound by the fraud of an agent acting within the scope of his authority, relying upon *Crawford v. Davison-Paxon Company*, 46 Ga.App. 161, 166 S.E. 872 (Ga.Ct. Apps.1932); *In re Pulver*, 146 Wash. 597, 264 Pac. 406 (1928); *Barber v. Stephenson*, 260 Ala. 151, 69 So.2d 251 (1953). Defendant, on the other hand, relying primarily upon *In re Walker*, 726 F.2d 452, 11 B.C.D. 737 (8th Cir.1984), urges that something more than merely the existence of a principal-agent relationship must be shown before a debtor/principal will be held liable for the fraud of his agent; it must further be shown in order that the debt be held non-dischargeable as to the debtor/principal, that the debtor knew or should have known of the fraud of the agent. Moreover, *Walker* holds, it will be sufficient for a holding of non-dischargeability to show that debtor was recklessly indifferent to the acts of his agent.

Resolution of this conflict in the law is not made easier by the subsequent decision of the bankruptcy court in *In re Walker*, 53 B.R. 174 (Bankr.W.D.Mo.1985), in which the bankruptcy court dealt with the *Walk-*

*er* case subsequent to remand from the Eighth Circuit Court of Appeals. In such subsequent decision, the bankruptcy court suggests that the Court of Appeals improperly looked to standards applied in discharge cases rather than those appropriate for dischargeability cases, and that prior law for non-dischargeability required nothing more than the existence of a principal-agent relationship. (Under the Bankruptcy Code, the former (discharge) are dealt with in § 727, while the latter (dischargeability) are dealt with in § 523. Under the predecessor Bankruptcy Act, the same distinction occurred and was to be found in § 14 for discharge and § 17 for dischargeability). Despite these reservations by the bankruptcy judge, it is quite clear that the decision of the Court of Appeals by its terms applies to dischargeability questions under § 523 of the Bankruptcy Code, and that is the nature of the matter before us.

We believe that the standard applied by the Eighth Circuit Court of Appeals in its *Walker* decision is the sounder approach of the two advanced by the parties here. If one examines the provisions of 11 U.S.C. § 523, it is apparent that two broad categories of debts are dealt with in the ten subdivisions of § 523(a). One broad category relates to public policy matters. Thus, at § 523(a)(1), taxes are made non-dischargeable; at § 523(a)(3), unlisted debts are made non-dischargeable; at § 523(a)(5), alimony, maintenance, and child support obligations are made nondischargeable; at § 523(a)(7), a fine, penalty, or forfeiture to the government is made non-dischargeable; at § 523(a)(8), student loans are made non-dischargeable; at § 523(a)(9), drunk driving debts are made non-dischargeable; and at § 523(a)(10), debts surviving a prior bankruptcy are made non-dischargeable.

■ The other broad category may be characterized as debts which ought not to be dischargeable because they arose from wrongful acts. This category is comprised of those debts set forth at § 523(a)(2), debts due to false and fraudulent acts; at § 523(a)(4), debts due to fraud or defalcation of a fiduciary, embezzlement, or larceny; and § 523(a)(6), debts arising from willful and malicious injury. The distinction between these two broad categories suggests to us that it is only in the first category, those arising from public policy considerations, that a debt will be held to survive a discharge in bankruptcy in the absence of an intentional and wrongful act by the debtor. For a holding of non-dischargeability in the second broad category, it seems plain that it is intended that the punishment of non-dischargeability will be imposed where the debtor himself has actively committed an immoral and/or inequitable act.

■ Having arrived at the standard to be applied, we must review the evidence to see whether plaintiff has succeeded in meeting the burden required by that standard. There are two facts in the record to which plaintiff can point to support a holding of non-dischargeability. The first is the confrontation on August 31, 1984 between plaintiff and Hague when defendant was present. While plaintiff, in his presentation, makes much of this event, it cannot avail him. The reason is that all of Hague's fraudulent acts occurred prior to that confrontation and what defendant then learned is not material.

The other fact is that at her meeting with Rump and Ankenbauer at CCC in July, 1984, defendant expressed suspicion of the honesty and integrity of Hague. This occurred, as we have seen, prior to the time in August, 1984 when plaintiff paid CCC for an engine about which Hague thereafter engaged in fraudulent conduct. We are compelled to conclude that when defendant, the owner of the business, thereafter permitted Hague to continue to operate it, she was being "recklessly indifferent" to the acts of Hague, her agent. Defendant thereby conducted herself in a manner which, within the guidelines of *Walker*, requires a holding of non-dischargeability.*

* We limit our conclusion to a holding of non-dischargeability because plaintiff did not pray for,

The foregoing constitutes our findings of fact and conclusions of law.

Accordingly, we find the issues here in favor of plaintiff and conclude that defendant's debt to plaintiff be non-dischargeable.

nor make out a case for, damages. We observe from the bankruptcy schedules filed by defendant that there is a case pending in state court regarding the Cory claim, and it would seem

that plaintiff here expects, after appropriate proceedings regarding the § 362 automatic stay which is in place, to proceed further in the state court.