**BANCBOSTON MORTGAGE CORPORATION**

v.

**Thomas E. LEDFORD, et al.**

**In re Thomas E. LEDFORD, Debtor, J. Gregg Sikes, Debtor.**

**BANCBOSTON MORTGAGE CORPORATION**

v.

**Thomas E. LEDFORD, et al.**

Nos. 3:90–0661, 3:90–0873.

United States District Court, M.D. Tennessee, Nashville Division.

April 26, 1991.

D. Reed Houk, Paul S. Davidson, Stokes & Bartholomew, Nashville, Tenn., for Bancboston Mortg. Corp.

William Caldwell Hancock, Nashville, Tenn., for Ledford.

Paul E. Jennings, Nashville, Tenn., for Sikes.

## MEMORANDUM

WISEMAN, Chief Judge.

These two cases, consolidated in the bankruptcy court below, arose from the failure of a condominium development in Nashville, Tennessee, and the subsequent personal bankruptcy filings of the two partners in the development. The bank that financed the development, alleging that it had disbursed the loan proceeds because of fraud, sought to have the partners' debt to it declared nondischargeable under 11 U.S.C. § 523(a)(2)(A). The bankruptcy court held that defendant Thomas E. Ledford's debt was nondischargeable but that defendant J. Gregg Sikes' debt was dischargeable. Both Ledford and the bank have appealed the bankruptcy court decision. For the following reasons, the Court affirms in part and reverses in part.

## I.

Thomas E. Ledford ("Ledford") and J. Gregg Sikes ("Sikes") were general partners in Montclair, Ltd. ("Montclair"), a Tennessee limited partnership. Ledford was also the president and sole stockholder in Ledford Properties, Inc., the developer retained by Montclair. Montclair's object was to develop a condominium complex on West End Avenue in Nashville.

In April, 1986, Ledford obtained a loan from BancBoston Mortgage Corporation ("BBMC") of $1,600,000.00 to acquire land on which the condominiums would be built. The parties amended the loan agreement in October 1986 to increase the principal to $6,225,000.00 to provide funds for construction of the project.

Under the terms of the agreements, Montclair was required to obtain twenty contracts for sale of condominium units before BBMC would disburse the loan funds. In September 1986, this was reduced to fourteen contracts. The contracts had to be legally enforceable with bona fide third-party purchasers and entered into upon forms provided by BBMC. In addition, the contracts were not to be amended without BBMC's written consent, and they had to comply with certain minimum sales price and earnest money deposit requirements.

By November 1986, Montclair had presented to BBMC the required fourteen contracts, which, on their face, complied with all conditions of the loan agreement. Despite their apparent compliance, seven of these contracts contained contingencies added by addendum or verbal side agreements which were not disclosed to BBMC.

As a result of this fraud and misrepresentation, BBMC disbursed the construction loan funds in December 1986. While the project was substantially completed by October 1987, only one of the fourteen contracts had closed by December of that same year. Montclair defaulted on the terms of the loan in January 1988. BBMC learned of the misrepresentations while attempting to close the other contracts, and in May 1988, instituted an action against Ledford and Sikes on their personal guar-

anties of the loan. United States District Court Judge Higgins entered a judgment against the partners in January 1989. *Bancboston Mortgage Corporation v. Ledford,* No. 3:88–0429 (M.D.Tenn. Jan. 3, 1989).

Ledford filed for personal bankruptcy in December 1988, and Sikes filed for personal bankruptcy on January 30, 1989.

The bankruptcy court held that Ledford's debt to BBMC on the guaranty was nondischargeable under 11 U.S.C. § 523(a)(2)(A). The court found that: Ledford made material misrepresentations to BBMC; Ledford knew that the contracts did not comply with the terms of the loan agreement; Ledford made the representations with the intent to deceive BBMC; BBMC reasonably relied on the misrepresentations; and the misrepresentation caused BBMC's actual damages.

By contrast, the bankruptcy court held that Sikes' debt to BBMC on his guaranty was dischargeable. The court reasoned that there was insufficient evidence to prove clearly and convincingly that Sikes participated in, or had knowledge of his partner's actions, and that the fraud could not be imputed to Sikes as a matter of law.

Ledford appealed to this court the nondischargeability of his debt to BBMC. BBMC appealed the bankruptcy court's discharge of Sikes' debt.

These cases present two issues for this court to decide: First, whether the bankruptcy court erred in finding that BBMC reasonably relied on Ledford's misrepresentations; and second, whether the bankruptcy court erred in holding that Ledford's fraud could not be imputed to Sikes for the purpose of determining the dischargeability of Sikes' debt to BBMC.[1]

## II.

Under Bankruptcy Rule 8013, the district court is directed that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." The Advisory Committee Note makes clear that the rule accords to the findings of a bankruptcy judge the same weight given the findings of a district judge under Fed.R. Civ.P. 52. *See Boone Coal and Timber Co. v. Polan,* 787 F.2d 1056, 1062 n. 4 (6th Cir.1986). Consequently, the district court must review the bankruptcy judge's legal conclusions de novo, not according any presumptions to the bankruptcy court's interpretation of applicable law. *Id.* at 1062; *In re Spain,* 103 B.R. 286, 289 (N.D.Ala.1988). *See also In re Daniels–Head & Associates,* 819 F.2d 914, 918 (9th Cir.1987) ("The district court acts as an appellate court, reviewing the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo."); *In re Martin,* 761 F.2d 1163, 1165 (6th Cir.1985).

## III.

Debts obtained by fraud are not dischargeable in bankruptcy. Section 523 of the Bankruptcy Code provides in pertinent part:

(a) A discharge ... does not discharge an individual debtor from any debt— ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement representing the debtor's or an insider's financial condition; ...

11 U.S.C. § 523(a)(2)(A). Both issues in this case turn on the interpretation of this provision. It is well established that the fraud exception to dischargeability includes a requirement that the lender's reliance on the debtor's misrepresentations be reasonable. *In re Phillips,* 804 F.2d 930, 932 (6th Cir.1986); *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985). Ledford's appeal is based primarily on the interpretation of this re-

---

1. Ledford also argues on appeal that the bankruptcy court erred in applying a "but for" test of proximate cause and also that it erred in granting any judgment to BBMC given its finding that BBMC's proof of damages was not precise, and in failing to adjudicate the amount of damages. This Court finds both of these arguments without merit and affirms the bankruptcy court's opinion in both respects.

quirement of reasonable reliance. In Sikes' case, BBMC's appeal turns on whether the fraud specified in § 523(a)(2)(A) can be imputed to Sikes from his partner, Ledford.

## A. Reasonable Reliance

The seminal case in the Sixth Circuit on reasonable reliance is *Phillips*. *Phillips* involved a mortgagee of a farm who failed to conduct a title search because of a personal relationship with the mortgagor. The mortgagee sought to have the debt declared nondischargeable because the mortgagor had misrepresented the size of the property. The court held that cases involving reliance in a commercial setting were inapposite to this situation, and that the reliance was reasonable.

In *Phillips*, the court considered three approaches to interpreting the reasonable reliance requirement of 11 U.S.C. § 523(a)(2)(A):

(1) Reasonable reliance is not required. *In re Sobel*, 37 B.R. 780, 785–86 (Bankr.E.D.N.Y.1984); *In re Fosco*, 14 B.R. 918, 921–23 (Bankr.D.Conn. 1981).

(2) Reasonable reliance is required because the bankruptcy policy of providing debtors with a "fresh start" outweighs the rights of creditors who rely unreasonably. *In re Newmark*, 20 B.R. 842, 861–62 (Bankr.E.D.N.Y. 1982).

(3) Reasonable reliance is circumstantial evidence of actual reliance. *In re Garman*, 643 F.2d 1252, 1256 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

804 F.2d at 932–33. The Sixth Circuit, which had previously adopted the reasoning of *Garman* with respect to § 523(a)(2)(B) cases (involving fraudulent financial statements), *see Martin*, 761 F.2d 1163, adopted it for § 523(a)(2)(A) cases as well. 804 F.2d at 933.

The Sixth Circuit held that the critical concern is to accord " 'a construction of the [Bankruptcy Code that] is consonant with equity, and consistent with the object and intention of Congress in enacting a general

law by which the *honest* citizen may be relieved from the burden of hopeless insolvency.' " *Phillips*, 804 F.2d at 933 (citing *Neal v. Clark*, 95 U.S. (5 Otto) 704, 709, 24 L.Ed. 586 (1877) (emphasis in original)).

The reasonable reliance requirement balances the recklessness of the lender with the culpability of the debtor who has defrauded him. *Phillips* relied on *Martin* to reach the conclusion that "the reasonableness requirement was intended to incorporate prior case law into the current Bankruptcy Act.... As such, it cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith." 804 F.2d at 933 (citing *Martin*, 761 F.2d at 1163). The *Martin* court had observed that Congress was concerned that creditors use, when feasible, other data sources, such as credit bureau reports, to determine the accuracy of the debt list. 761 F.2d at 1166. Such a determination requires consideration of all facts and circumstances, including the size of the loan.

Following *Garman*, several courts have described its standard almost as a recklessness test: reliance would be reasonable provided the representation relied upon appeared sufficient and accurate. *See Knoxville Teacher's Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir.1986); *In re Sanders*, 110 B.R. 328, 330–31 (Bankr.M.D. Tenn.1989); *In re Constantino*, 72 B.R. 231, 235 (Bankr.N.D.Ohio 1987); *In re Winfree*, 34 B.R. 879, 885 (Bankr.M.D. Tenn.1983); *cf. In re Weiner*, 86 B.R. 912, 915 (Bankr.N.D.Ohio 1988) ("facially erroneous" financial statement contained errors so gross as to negate actual reliance).

The *Garman* standard incorporates deference to the business judgment of the creditors. The critical issue is whether reliance on the representations was reasonable, not whether the decision to loan money was reasonable. Care must be taken to avoid scrutinizing the creditor's business judgment instead of determining whether reliance was reasonable. *Garman*, 643 F.2d at 1258; *In re Hall*, 109 B.R. 149, 154–55 (Bankr.W.D.Penn.1990); *In re Kroh*, 88 B.R. 987, 995 (Bankr.W.D.Mo. 1988).

Ledford relies on *In re Ward*, 857 F.2d 1082 (6th Cir.1988) to support his argument that his debt should be dischargeable. *Ward* involved a debtor to whom a bank issued a credit card without any inquiry, which would have revealed a recent embezzlement conviction and hopeless insolvency. The court held that the bank's reliance on the debtor's false representations was unreasonable, and that it had a duty to conduct a credit check prior to issuing the card. According to the Sixth Circuit, the bank had assumed the risk of non-payment: "This court rejects extending preferential protection at the expense of other unsecured creditors, to credit card companies which profit from extending consumer credit at the risk of non-payment, which risk is factored into finance charges which are higher than the rates charged by other lenders." 857 F.2d at 1085.

The *Ward* court's normative and deterrent desires, and its concern with the bank's behavior, apparently led it to declare general requirements for lenders. In this respect, it is similar to the Tenth Circuit's decision in *In re Mullet*, 817 F.2d 677 (10th Cir.1987), in which a bank loaned $86,000 to a 23–year old who owned stock which he claimed was traded on the New York Stock Exchange, but which actually was the stock of a company with a similar name. Noting that "minimal investigation and verification almost certainly would have uncovered the falsity of the representation," *id.* at 680, the court held that the bank's reliance was unreasonable. Both *Ward* and *Mullet* are egregious cases, which may justify a departure from the *Phillips* standard to one which asks whether the lender's decision to loan had any justification.

*Ward* clearly is distinguishable from this case. First, in *Ward*, there was no prior relationship between the borrower and the lender. In this case, Ledford had borrowed money from BBMC for the successful development of a prior project, the Park Circle condominiums, without misrepresentation. Such prior dealings have been a significant factor in other cases. In *Phillips*, for example, the friendship between the mortgagee and mortgagor was paramount.

The court ruled that commercial lending cases were inapposite where there is such a relationship. *Phillips*, 804 F.2d at 933. *See also Martin*, 761 F.2d at 1166–67; *Garman*, 643 F.2d at 1257; *In re Lambert*, 64 B.R. 170, 177 (Bankr.E.D.Tenn.1986).

Second, this case, unlike *Ward*, involves a sophisticated borrower dealing at arm's length with the lender. Where the debtor is an unsophisticated consumer, as in *Ward*, one can argue that lenders have a greater responsibility to determine creditworthiness. Indeed, many consumers may be unable to determine without assistance the amount of debt they can carry safely. Ledford, however, possesses a master's degree in public administration and is an experienced real estate developer. *See* Memorandum of Bankruptcy Court ("Memorandum"), June 22, 1990, at 21.

■ In short, there is nothing in *Ward* to mandate a departure from the standard the Sixth Circuit announced in *Phillips:* that reliance is reasonable provided the representation relied upon appears sufficient and accurate. The question in the instant case is whether the contracts satisfy this requirement, and whether there were "red flags"—facts which should have put BBMC on notice. In answering these questions, the Court reiterates that the requirement of reasonable reliance is "directed at creditors acting in bad faith." *Martin*, 761 F.2d at 1166. *See also Garman*, 643 F.2d at 1256. Moreover, the sufficiency of the contracts must be interpreted in light of the purpose for which they were required: to prove substantial market interest in the condominium units. This purpose does not necessitate the same scrutiny as would a personal financial statement. As the bankruptcy court found, BBMC checked each contract for the required elements, and rejected a contract which contained contingencies. Memorandum at 22.

■ In this case, Ledford argues that sufficient indicia of unreliability existed to have warned BBMC that the contracts were not reliable. Ledford argues that four "red flags" put BBMC on notice about

problems with the contracts. These include:

(1) Handwriting on Sands and Tant contracts. Two of the contracts contained handwriting indicating that the buyers reserved the ability to sell their contracts. But since nothing indicated to BBMC that the purchasers of these contracts would not be bound, or that the original buyers (Sands and Tant) would be released by any contingency other than finding another buyer, these contracts did not put BBMC on notice that the contracts were anything other than bona fide. This contention is without merit.

(2) Layman contract. The most substantial issue Ledford raises is that one contract contained handwriting indicating the incorporation of an attached addendum which was not submitted to BBMC. The fact that the described addendum was never submitted should have raised suspicions. The bankruptcy court found, however, that BBMC's manager never saw the note—an oversight on his part. Memorandum, at 18. This is a finding of fact, subject to a clearly erroneous standard of review under Bankr.R. 8013 and nothing in the Memorandum of decision or the briefs of the parties indicates that the bankruptcy judge's finding was erroneous.

(3) Reduction in number of pre-sale contracts. The loan agreement initially required twenty pre-sale contracts. The parties subsequently agreed to reduce this requirement to fourteen contracts. This issue demonstrates the shadowy line between assessing the reasonableness of reliance and second-guessing the creditor's decision to lend. Certainly, Ledford's request to reduce the number of contracts indicated a softer market for the units; however, it cannot be said to reasonably raise the suspicion that he would be fabricating contracts.

(4) Required delivery dates in some contracts did not meet builder's completion dates. As the bankruptcy judge noted, this problem "does not take away from the fact that if these were bona fide contracts they would have shown the existence of a market and the acceptance of the developer."

See Memorandum at 23. The significance of this deviation must be interpreted in light of the contracts' purpose in the loan agreement. The contracts were needed simply to indicate market interest at the commencement of the project. As the bankruptcy court noted, "if these were bona fide contracts they would have shown the existence of a market and the acceptance of the developer." Memorandum at 23. The purchasers' acceptance of the contract therefore served its purpose vis-a-vis the loan agreement regardless of the problem with the dates.

Ledford's "red flags" are, as the brief for BBMC indicates, really "red herrings." Brief for Appellee at 17. There is no evidence to indicate that BBMC had knowledge of facts which should have put it on notice that its reliance on the contracts for the purpose they were to serve—to indicate market interest—was unreasonable or illusory. Neither the facts nor the law justify reversal. As a result, the bankruptcy court's holding that Ledford's debt to BBMC is not dischargeable under 11 U.S.C. § 523(a)(2)(A) is affirmed.

### B. *Imputed Fraud*

█ The courts are split on whether the fraud of one partner may be imputed to another in determining the dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A). As the bankruptcy court noted, "[s]ome courts have held that the fraud of an authorized agent, without more, is grounds for nondischargeability of the principal...." Memorandum of Bankruptcy Court, Sept. 12, 1990, at 3. Other courts, however, refuse to impute the fraud for purposes of determining dischargeability, without proof of knowledge or intent. The bankruptcy court expressly rejected imputation of fraud for the purpose of determining dischargeability without such proof. The Sixth Circuit has not addressed this issue.

The bankruptcy court's decision is supported by a short and troubled line of cases. Four arguments emerge in these cases to support the proposition that a debt

obtained by fraud is dischargeable as to an innocent partner:

(1) Changes made in enacting the Bankruptcy Code require intent to deceive on the part of each partner held liable;

(2) Precedent under the Bankruptcy Act and Code establishes a requirement of actual or constructive knowledge to impute fraud;

(3) *Neal v. Clark,* 95 U.S. (5 Otto) 704, 24 L.Ed. 586 (1887), establishes that fraud may not be imputed to an innocent partner; and

(4) The structure of § 523 of the Bankruptcy Code evinces a requirement of wrongful conduct by the debtor himself.

Each of these arguments is considered in turn below. The Court finds that each is without merit.

First, Sikes maintains that changes made in the enactment of the Bankruptcy Code indicate that fraud should be imputed to a debtor only when that debtor knew of the partner's fraud. In *Matter of Gray,* 22 B.R. 676 (Bankr.W.D.Wis.1982), the bankruptcy court cited an alleged change in law upon the enactment of the Code as the basis for its decision not to impute fraud to an ignorant partner for purposes of determining dischargeability. In *Gray,* a father and son were partners in a construction business. The son submitted a false financial statement to a supplier in order to secure credit, and the supplier sought to have the debt declared nondischargeable when the father subsequently declared bankruptcy. In response to the supplier's motion for summary judgment, the bankruptcy court held that § 523(a)(2)(A) required knowledge and intent, and the existence of these issues of fact precluded summary judgment. The court reviewed the pre-Code cases interpreting the predecessor to § 523, and held them to be inapposite, because of the addition of language requiring intent to deceive. *Id.* at 680.

But the bankruptcy court in *Matter of Walker,* 53 B.R. 174 (Bankr.W.D.Mo.1985) (*"Walker II"*) demonstrated that in fact there had been no change in the law

through the addition of the language to § 523. Section 523(a)(2) is derived from § 17(a)(2) of the former Bankruptcy Act, 11 U.S.C. § 35 (repealed 1978). The *Walker II* court's specific criticism of *Gray* is that it interpreted the Code's dischargeability provision, 11 U.S.C. § 523(a)(2), as being closely related to the Act's discharge provision. *Id.* at 180. This court agrees with *Walker II* that *Gray* erred in claiming that the Code added intent to deceive language, thereby barring imputation of fraud to an ignorant partner. In fact, the Act contained a nearly identical requirement. A comparison reveals that § 523(a)(2)(B)(iv) of the Code renders nondischargeable debts "that the debtor caused to be made or published *with intent to deceive,"* (emphasis added) while § 17(a)(2) of the Act applies to those debts that the debtor "made or published or caused to be made or published in any manner whatsoever *with intent to deceive* (emphasis added)."

Moreover, the legislative history of § 523(a)(2) does not reveal substantive changes that would justify a reversal of precedent under the Act. *See In re Paolino,* 75 B.R. 641, 647 (Bankr.E.D.Penn. 1987). The Code added a section rendering nondischargeable debts obtained with false financial statements, 11 U.S.C. § 523(a)(2)(B), and added the words "actual fraud" to the general fraud exception to discharge. *Id.* at 646. But the latter change merely reflects the adoption of prior case law, including *Neal,* 95 U.S. (5 Otto) 704, which, as discussed *infra,* did not invalidate fraud imputed to an innocent partner. *Id. See also* 124 Cong.Rec. H11,095 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards).

Second, the Bankruptcy Court relies on two cases which claim that prior case law justifies discharge of an innocent partner's debt: *In re Anderson,* 29 B.R. 184 (Bankr. N.D.Iowa 1983), and *Matter of Walker,* 726 F.2d 452 (8th Cir.1984) (*"Walker I"*). Upon examination, the Court finds that neither of these cases is persuasive.

In *Anderson,* a partner in a tire store submitted false financial statements to obtain credit. The "innocent" partner discov-

ered the misrepresentation when the "guilty" partner had a nervous breakdown. The court followed *Gray,* and held that it would not impute one partner's intent to deceive to the other innocent partner. *Id.* at 191. In arriving at this conclusion, the court held that "[t]he clear legislative policy of discharging the honest debtor would be negated by imputing the deceptive intent of one partner to an honest, innocent debtor partner." *Id.*

In *Walker I,* the debtor and his wife ran a hardware store. The debtor became sick, and turned the business over to his wife, who assigned fictitious accounts receivable to a bank for loans. After discovering the fraud, the debtor filed for bankruptcy under Chapter 7. The bankruptcy court declared the debt nondischargeable, but the district court reversed, claiming that proof of the debtor's knowledge was necessary. The Eighth Circuit remanded the case, holding that the bankruptcy court's findings were insufficient to decide the case. It announced that, "[P]roof that a debtor's agent obtains money by fraud does not justify the denial of discharge to the debtor, unless it is accompanied by proof which demonstrates or justifies an inference that the debtor knew or should have known of the fraud." *Id.* at 454. It also observed that reckless indifference would not justify discharge.

Both opinions were called into question in the opinion of the bankruptcy court of *Walker I* on remand—*Walker II.* The court criticized *Anderson* for an "avulsive departure from the law of nondischargeability upon a nonexistent set of authorities." 53 B.R. at 179–80. Moreover, the court rebuffed the Eighth Circuit's opinion in *Walker I,* claiming that its opinion on dischargeability was based upon authorities related only to the question of discharge. *Id.* at 180–81. *Walker I* also has been criticized by other courts that have addressed this issue. *See In Re Futscher,* 58 B.R. 14, 17 (Bankr.S.D.Ohio 1985); *Paolino,* 75 B.R. at 649. The bankruptcy court in *Walker II* nevertheless conducted an evidentiary hearing, and, concluding that the debtor should have known of his wife's

misrepresentations, determined (again) that the debt was not dischargeable.

*Walker II* forcefully argues that the support for requiring a partner's actual or constructive knowledge is inadequate. The thrust of the bankruptcy court's argument in *Walker II* is that the handful of courts which have imposed this requirement have confused discharge with dischargeability, and that this confusion has arisen from the differences between the Bankruptcy Act and the Code with respect to discharge. Section 14(c) of the Act provided that a *discharge* (i.e. in its entirety) would be denied to debtors who had obtained property based on fraud. Section 14(c) provides in pertinent part that: "The Court shall grant the discharge unless satisfied that the bankrupt has ... obtained for such business money or property ... by making or publishing or causing to be made ... a materially false [financial] statement...." By contrast, Section 17 held that *specific debts* so obtained were nondischargeable. The bar to discharge was dropped when the Code was enacted. Section 17 provides in pertinent part that: "A discharge in bankruptcy shall release a bankrupt from all of his provable debts ... except such as ... are liabilities for obtaining money or property by ... a materially false [financial] statement...." Under the Code, fraud or misrepresentation does not bar a discharge itself, but continues to render the debt so obtained nondischargeable. 11 U.S.C. § 523(a)(2).

The courts interpreting the Act held that fraud would not be imputed to bar discharge itself, but would be imputed to bar dischargeability of the specific debt. *See Walker I,* 726 F.2d at 177; *Paolino,* 75 B.R. at 647. It is easy to confuse these issues, and some courts (including those in *Anderson* and *Walker I*) relied on the discharge cases to justify their dischargeability holdings. *See Walker II,* 53 B.R. at 180–81 ("Each of the authorities thus alluded to by the court of appeals was exclusively a denial of discharge case."). Again, this court agrees with *Walker II* that the better reasoned case law supports imputation of fraud without knowledge.

Third, Sikes argues that the bankruptcy court opinion is supported by Supreme Court precedent. But it is a misuse of authorities to rely on *Neal*, 95 U.S. (5 Otto) 704, for the proposition that fraud cannot be imputed to an innocent partner. *Paolino*, 75 B.R. at 648.

In *Neal*, an executor sold some property of a decedent for some bonds. The executor then sold the bonds to Neal, who passed them on to another. The heirs later sued the executor for an accounting, and joined Neal as a defendant, claiming that, under the circumstances, Neal had participated in a wasting of the estate. Neal later declared bankruptcy, and the heirs sought to have the debt declared nondischargeable, because the fraud should be imputed to Neal. The Supreme Court of Virginia declared that, though Neal was innocent of actual fraud, he was nonetheless guilty of constructive fraud, and that the Bankruptcy Act's definition of fraud embraced both kinds. On appeal, the United States Supreme Court reversed, holding that:

'fraud' referred to in that section means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality. Such a construction of the statute is consonant with equity, and consistent with the object and intention of Congress in enacting a general law by which the honest citizen may be relieved from the burden of hopeless insolvency.

95 U.S. at 709.

The bankruptcy court in *In re Buck*, 75 B.R. 417 (Bankr.N.D.Cal.1987), relied on *Neal* in holding that actual fraud could only be imputed where the partner was a knowing and active participant in the scheme to deceive. But the *Buck* court's interpretation of *Neal* does not consider that the Supreme Court had itself refused to extend *Neal* in *Strang v. Bradner*, 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885). *See Paolino*, 75 B.R. at 648. *Strang* involved a situation similar to that at hand: one partner defrauded creditors without the other partners' knowledge. Justice Harlan, writing for the unanimous Court as he had in *Neal*, based the decision holding the debt nondischargeable on agency law:

Whether this action be regarded as one to recover damages for the deceit practiced upon the plaintiffs, or as one to recover the amount of a debt created by fraud upon the part of Strang, we are of opinion that his fraud is to be imputed, for the purposes of this action, to all members of his firm. . . . Each partner was the agent and representative of the firm with reference to all business within the scope of the partnership. And if, in the conduct of partnership business, and with reference thereto, one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, and without notice of any limitations upon his general authority, his partners cannot escape the pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge. This is especially so when, as in the case before us, the partners, who were not themselves guilty of wrong, received and appropriated the fruits of the fraudulent conduct of their associate in business.

*Strang*, 114 U.S. at 561, 5 S.Ct. at 1041. Thus, the Supreme Court explicitly refused to apply *Neal* as the *Buck* court suggested should be done. *Id.*

Finally, at least one bankruptcy court has based its refusal to impute liability to an innocent partner on a structural analysis of § 523. *In re Futscher*, 58 B.R. 14 (Bankr.S.D.Ohio 1985). In *Futscher*, the debtor was the ostensible owner of a Corvette repair shop, purchased by a disreputable friend who eventually left the city. The shop was managed by its previous owner, who defrauded a customer of money paid for parts which were never ordered. The bankruptcy court noted the dubious quality of the *Walker I* decision, but nevertheless adopted a similar position based on its analysis of § 523. 58 B.R. at 17. It reasoned that § 523 exceptions from discharge can be divided into those which are based on policy considerations (e.g. student loans), and those which are based on

the wrongful conduct of the debtor (e.g. fraud). It held that nondischargeability because of fraud was not a policy-based exception, and required some blameworthy conduct on the part of the debtor. In the case before it, the bankruptcy court held the debt to be nondischargeable because the ostensible owner had knowledge of the manager's dishonesty prior to the customer's payment.

The Court in *Futscher* divined its rule from the structure of § 523:

> If one examines the provisions of 11 U.S.C. § 523, it is apparent that two broad categories of debts are dealt with in the ten subdivisions of § 523(a). One broad category relates to public policy matters. Thus, at § 523(a)(1), taxes are made non-dischargeable; at § 523(a)(3), unlisted debts are made non-dischargeable; at § 523(a)(5), alimony, maintenance, and child support obligations are made non-dischargeable; at § 523(a)(7), a fine, penalty, or forfeiture to the government is made non-dischargeable; at § 523(a)(8), student loans are made non-dischargeable; at § 523(a)(9), drunk driving debts are made non-dischargeable; and at § 523(a)(10), debts surrounding a prior bankruptcy are made non-dischargeable.
>
> The other broad category may be characterized as debts which ought not to be dischargeable because they arose from wrongful acts. This category is comprised of those debts set forth at § 523(a)(2), debts due to false and fraudulent acts; at § 523(a)(4), debts due to fraud or defalcation of a fiduciary, embezzlement, or larceny; and § 523(a)(6), debts arising from willful or malicious injury. The distinction between these two broad categories suggests to us that it is only in the first category, those arising from public policy considerations, that a debt will be held to survive a discharge in bankruptcy in the absence of an intentional or wrongful act by the debtor.

*Futscher*, 58 B.R. at 17.

This is a novel reading of the Code, and it contradicts evidence that Congress did not intend to make major substantive changes in this area. *See Paolino*, 75 B.R. at 646. Moreover, it ignores the long line of cases imputing liability to an innocent partner, and the Supreme Court's admonition that changes in statutory interpretation must be supported by clear Congressional intent. *Kelly v. Robinson*, 479 U.S. 36, 47, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986).

The other sources cited by Sikes are similarly unpersuasive: each refers to a case involving the imputation of fraud between spouses, and are decided without regard to agency law. *Cf. Paolino*, 75 B.R. at 648–50. They are inapposite to this case. With the exception of the cases discussed above —*Gray, Anderson, Walker I, Futscher*, and *Buck*—the authorities are in agreement that the fraud of one partner may be imputed to another for determining dischargeability under 11 U.S.C. § 523(a)(2). *See, e.g., In re Cecchini*, 780 F.2d 1440, 1444 (9th Cir.1986); *Paolino*, 75 B.R. at 649–50; *Walker II*, 53 B.R. at 181–82; *In re Beleau*, 35 B.R. 259, 262 (Bankr.D.R.I. 1983); and *In re Lowther*, 32 B.R. 638, 641–42 (Bankr.W.D.Okla.1983).

■ It is equally clear that, under Tennessee state law, the fraud of one partner must be imputed to another. In *Griffin v. Bergeda*, 279 S.W. 385, 152 Tenn. 512 (1926), the Tennessee Supreme Court imputed fraud to a partner for purposes of determining dischargeability under the Bankruptcy Act. *See also George Busby Ford, Inc. v. Ross*, 62 Tenn.App. 80, 459 S.W.2d 46 (1970) (following *Griffin*). Imputed liability is also mandated by statute in Tennessee. Tennessee has adopted the Uniform Partnership Act, which provides:

> Wrongful acts of partners.—Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss of injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable

therefor to the same extent as the partner so acting or omitting to act. T.C.A. § 61–1–112 (1989). Under Tennessee state partnership law, Ledford's fraud should be imputed to Sikes regardless of the latter's ignorance of the fraud.

The imputation of fraud in this case not only coincides with well-settled law, it is also sound policy. As Ledford's general partner, Sikes had the opportunity and duty to ensure that the affairs of the partnership were conducted with integrity. He was in the best position to prevent the fraud, and to discover it before it damaged the partnership's creditors. By participating as a general partner, Sikes accepted these obligations. If he desired a lesser role in the management of the partnership, and more limited liability, he could have chosen either a limited partnership or a corporate form of business. Instead, he chose to participate as a general partner, and he must accept responsibility for the acts of his partner.

For the foregoing reasons, the decision of the bankruptcy court, holding that Sikes' debt to BBMC is dischargeable, is reversed.

An appropriate order will be so entered.